UNITED STATES OF AMERICA
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JANE DOE, )<br>    *Plaintiff*, )<br>)<br>v. )<br>)<br>WENTWORTH INSTITUTE OF TECHNOLOGY, INC., )<br>d/b/a WENTWORTH INSTITUTE OF TECHNOLOGY, )<br>    *Defendant*. ) | Civil Action No. 1:21-cv-10840 |

## COMPLAINT AND DEMAND FOR JURY TRIAL

### PARTIES

1. The Plaintiff, Jane Doe, is an individual residing in the State of Rhode Island.

2. The Defendant, Wentworth Institute of Technology, Inc., d/b/a Wentworth Institute of Technology ("Wentworth," "WIT," and/or "the school"), is a private institution of higher education with its campus and principal offices located at 550 Huntington Avenue, Suffolk County, Boston, Massachusetts 02115.

### STATEMENT OF JURISDICTION AND VENUE

3. This action arises out of Wentworth's violations of Title IX of the Education Amendments Act of 1972, 20 U.S.C. § 1681, et seq. ("Title IX"), and the Defendant's breach of its contractual obligations to the Plaintiff.

4. This Court has jurisdiction over the Plaintiff's Title IX claim pursuant to 28 U.S.C. § 1331.

5. This Court has jurisdiction over the Plaintiff's common law claims pursuant to 28 U.S.C. § 1367.

6. Venue in this District is proper pursuant to 28 U.S.C. §§ 1391(b)(1) and (2), as the Defendant is located in Massachusetts and the events giving rise to the Plaintiff's claims occurred in Massachusetts.

### INTRODUCTION

7. The Plaintiff is a current student enrolled at Wentworth, and at all times relevant to this Complaint, she attended the school.

8. The Plaintiff is a female student who, while enrolled at Wentworth, was the victim of sex-based discrimination and, more specifically, was sexually assaulted by a male Wentworth student. Wentworth discriminated against the Plaintiff and violated her established federal rights under Title IX when it failed to adequately investigate the assault and failed to take appropriate remedial measures.

9. At all times relevant to this Complaint, Wentworth was, and still is, the beneficiary of federal funds within the meaning of Title IX, and as such, the school has an obligation to obey state laws related to sex-based discrimination, as well as the law as outlined in Title IX; they have an obligation to adhere to and implement the Department of Education's Office of Civil Rights Guidance on Title IX; and they also have an obligation to stay apprised of new developments in Title IX case law and adjust their Title IX procedures/policies accordingly.

### General Requirements of Title IX

10. Title IX is a comprehensive federal law that prohibits any federally funded educational institution from discriminating on the basis of sex. Title IX protects students from all forms of sex-based discrimination, including but not limited to sexual misconduct and sexual harassment, as well as sexual violence, which is a type of sexual harassment under the law and includes conduct such as rape, sexual assault, sexual battery, sexual abuse, and/or sexual coercion.

11. In 1975, the Department of Health, Education and Welfare ("HEW" - the predecessor of the United States Department of Education ("USDE")) adopted regulations interpreting Title IX. These regulations (the "Regulations") are codified at 34 C.F.R. s. 106, et seq. The Office for Civil Rights ("OCR") within the USDE enforces Title IX.

12. To ensure compliance with Title IX, the OCR publishes updated guidance to schools, like WIT, on how to effectively comply with and implement the standards required under Title IX. The OCR's guidance publications include, but are not limited to, its Title IX Resource Guides, its Dear Colleague letter, and its Q&A on Campus Sexual Misconduct (collectively "OCR Guidance").

13. Pursuant to the OCR Guidance, and by way of example and not limitation, in order to achieve compliance with Title IX, Wentworth was, and is, required to do the following:

   a. In response to a Title IX complaint involving sex-based discrimination or harassment, schools must respond with a prompt, adequate, reliable, and impartial investigation into those complaints and provide an appropriate remedy to stop the discrimination and/or harassment and prevent its reoccurrence.

   b. Whether or not a student files a complaint of alleged sexual misconduct or otherwise asks the school to take action, where the school knows or reasonably

should know of an incident of sexual misconduct, the school must take steps to understand what occurred and to respond appropriately. In particular, when sexual misconduct is so severe, persistent, or pervasive as to deny or limit a student's ability to participate in or benefit from the school's programs or activities, a hostile environment exists and the school must respond.

c. Adopt and publish grievance procedures that provide for prompt and equitable resolution of complaints of sex discrimination, including sexual misconduct. By way of example and not limitation, for a school's grievance procedures to be considered "prompt and equitable," the school must: (i) provide notice of the school's grievance procedures, including how to file a complaint, to students; (ii) actually apply its grievance procedures in response to complaints; (iii) ensure an adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence; (iv) designate and follow a reasonably prompt time frame for major stages of the complaint process; and (v) the school's policy/procedures must provide assurance that the school will take steps to prevent recurrence of sexual misconduct and to remedy its discriminatory effects, as appropriate.

d. In its investigation, it is the school's burden, not the parties', to gather sufficient evidence to reach a fair, impartial determination as to whether sexual misconduct has occurred, and if so, whether a hostile environment has been created that must be redressed.

e. An equitable investigation of a Title IX complaint requires a trained investigator to analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility of parties and witnesses, synthesize all available evidence—including both inculpatory and exculpatory evidence—and take into account the unique and complex circumstances of each case.

f. When an investigation is opened that may lead to disciplinary action, each party (i.e. the complaining party and the respondent) must receive written notice in advance of any interview or hearing with sufficient time to prepare for meaningful participation.

g. The school's investigation should result in a written report summarizing the relevant exculpatory and inculpatory evidence. The parties must also have timely and equal access to any information that will be used during informal and formal disciplinary meetings and hearings.

h. The investigator(s), or separate decision-maker(s), with or without a hearing, must make findings of fact and conclusions as to whether the facts support a finding of responsibility for violation of the school's sexual misconduct policy. The findings of fact and conclusions should be reached by applying either a

       preponderance of the evidence standard or a clear and convincing evidence standard.

    i. Any process made available to one party in the adjudication procedure should be made equally available to the other party (for example, the right to have an attorney or other advisor present and/or participate in an interview or hearing; the right to cross-examine parties and witnesses or to submit questions to be asked of parties and witnesses).

    j. The school must avoid conflicts of interest and biases in the adjudicatory process and prevent institutional interests from interfering with the impartiality of the adjudication. Decision-making techniques or approaches that apply sex stereotypes or generalizations may violate Title IX and need to be avoided so that the adjudication proceeds objectively and impartially

14. Additionally, any proceeding conducted by Wentworth which arises from an allegation of sexual assault must include a prompt, fair, and impartial process from the time of the initial investigation up through the final end result in the grievance process. See 34 C.F.R. § 668.46(k)(2)(i).

**Wentworth's Contractual Obligations Pursuant to its Own Policies and Publications**

15. Wentworth's Sexual Misconduct and Sex-Based Discrimination Policy states in part, and is not limited to, the following rights afforded to students who make complaints of sexual discrimination and sexual assault:

    a. Complainants and Respondents have the right "to be treated equitably by the University" which includes WIT "following a grievance process that complies with this policy";

    b. The right to a fair, impartial proceeding that begins promptly;

    c. The right to a resolution process that is consistent with the University's policies, transparent to the Complainant, and in which the burden of proof and of gathering evidence rests with the University and not the parties;

    d. The right to an Advisor of the Party's choosing during the grievance process. If a Party does not have an Advisor present at a Title-IX related hearing, the University will provide without fee or charge, an Advisor of the University's choice;

    e. The right to an objective evaluation of all relevant evidence—including both inculpatory and exculpatory evidence—and provide that credibility determinations will not be based on a person's status as a Complainant, Respondent, or witness;

16. Pursuant to WIT's policies regarding the formal grievance and resolution process of student conduct complaints, WIT is obligated to abide by the following procedures, which include but are not limited to the following:

    a. Questions regarding a Complainant's prior sexual behavior or history will not be included in the investigative record or in the grievance hearing unless it is offered to prove someone other than the Respondent committed the conduct alleged by the complainant, or if the evidence concerns specific incidents of the Complainant's sexual behavior with the Respondent and is offered to prove consent.

    b. The Title IX Coordinator will send to each Party the final investigative report in an electronic format or a hard copy, for their review. This report will be shared no less than ten (10) business days prior to a hearing.

    c. The Advisor is responsible for conducting the cross-examination which includes asking the other Party and any witnesses all relevant questions and follow-up questions, including those challenging credibility. If a Party does not have an Advisor, the University will appoint one on behalf of the Party free of charge. In this capacity, the Advisor will be appointed for the sole purpose of conducting cross examination of the other Party and witnesses.

    d. The Decision-maker(s) shall use a preponderance of the evidence standard to determine whether the alleged violation of the policy occurred. The preponderance of the evidence means a standard of proof in which the totality of the evidence offered in support of a fact is greater or more convincing than the evidence which is offered in opposition to it; given the totality of information the version of events that is more likely than not. Preponderance of the evidence is understood to require more than 50 percent certainty to determine responsibility for a policy violation (51% or greater).

    e. The Complainant and Respondent will simultaneously receive a written determination regarding responsibility applying the preponderance of the evidence standard typically within five (5) business days of the determination of responsibility. The written determination letter, drafted by the Decision-maker(s) will include:
        - The allegations constituting Prohibited Conduct and a description of the procedural steps taken during the grievance process;
        - Findings of fact supporting the determination;
        - Conclusions regarding the application of the Policy to the facts;
        - A statement and rationale for the result of each allegation including findings, sanctions, and remedies; and
        - Options for appeal.

FACTUAL BACKGROUND

**Jane Doe is Raped in her Dorm Room on Campus by a Fellow WIT Student**

17. In the Fall of 2019, when she was 18 years old, Jane Doe began her freshman year at WIT and lived in the freshman dorms on campus.

18. Sadly, Jane's freshman year quickly took a life-altering turn on the evening of November 22, 2019, into the early hours of November 23, 2019, when a fellow student raped her in her dorm room while she was incapacitated from alcohol consumption. Her rapist was also a freshman at WIT.

19. On November 23, 2019, Jane awoke extremely distraught over what had happened and disclosed the assault to her friend.

20. Thereafter, on November 24, 2019, Jane disclosed the sexual assault to the coach of her sports team at the school, whom was a mandated reporter required to report any allegations of sexual misconduct to the school's Title IX Coordinator, per the school's own policy. Upon receipt of Jane's disclosure, the coach reported it to the Athletic Director, whom, upon information and belief, subsequently reported the incident to Annamaria Wenner, the Vice President for Student Affairs and Dean of Students.

21. The day after the assault, on November 24, 2019, Jane went to the WIT Police Department (a/k/a Campus Police) to report her rape. Specifically, Jane spoke with Sergeant Dexter Francis and Patrol Officer Robert Moran.

22. After this meeting ended, Sergeant Dexter reached out to Dean Wenner to notify her of Jane's report and interview. Upon information and belief, and per Wenner's own witness statement during the subsequent investigation, Sergeant Francis told Wenner "that the Complainant [Jane Doe] had been incapacitated and thus unable to give consent." When Sergeant Francis advised Wenner to issue a No Contact Order, Wenner refused, indicating that she would only do so if Jane requested it.

23. That same day, on November 24, 2019, Jane Doe presented to the hospital to undergo a rape kit (formally referred to as a Sexual Assault Nurse Examiner exam or a "SANE exam"). Upon information and belief, at the conclusion of the rape kit, Jane was rendered a diagnosis of "sexual assault of adult" and provided with a battery of medications to prevent and/or combat any sexually transmitted diseases that she may have been exposed to during the assault.

24. Campus Police also provided the hospital staff with evidence they collected from Jane's dorm room, including clothing, bedsheets, and other items.

25. On November 25, 2019, Jane presented to Dean Wenner to follow up on her rape report and to learn more about her options under Title IX. Jane requested a No Contact Order, which was issued that same day.

26. Upon information and belief, during this meeting, Dean Wenner did not explain in detail the various options available to Jane under Title IX and the school's policies, nor did Dean Wenner submit a Title IX report regarding the rape to Beth Devonshire, the Title IX Coordinator. Instead, Dean Wenner placed the burden on Jane to make a decision regarding how the rape complaint would be handled, despite the fact that WIT's own policies allow for a formal investigative process, even without a complainant's involvement or consent.

27. It was not until December 12, 2019, when Jane's mother contacted Dean Wenner about her daughter's rape, that Dean Wenner offered to put Jane in contact with the Title IX Coordinator, Beth Devonshire.

28. On December 19, 2019, approximately three weeks after Jane reported the rape to various school officials, Jane was able to have a meeting with Devonshire to discuss her options in full detail. During this meeting, Jane elected to proceed with the formal investigation process, which per the school's policy, is a process that typically take sixty (60) days to complete.[1]

29. After the assault, in approximately December 2019, Jane became very isolated from her friend group and the other students in her residence hall, as many of them had expressed disapproval of her decision to pursue a formal investigation against her rapist because they still remained friends with him.

30. Jane began to experience severe anxiety, emotional distress, depression, and feelings of alienation as a result of the sexual assault and she ended up moving to a different resident hall and sought counseling to deal with the trauma.

**WIT Begins the Formal Investigative Process that Jane Requested, but None of the Witnesses Are Interviewed Until Approximately 3 Months Later**

31. On December 20, 2019, the school issued a Notice of the formal Complaint to both Jane and her rapist and purported to initiate the formal investigative process. The Notice identified the Student Code of Conduct Violations alleged against Jane's rapist, which

---

[1] Under Title IX and per the school's policies, Complainants have the right to be notified of the time frame for major stages of the complaint process. For example, as the school's policies state, the school typically strives to complete investigations within 60 days, whenever possible. If an investigation will extend past 60 days, you will be notified of the extension and informed of the reason why.

included Sexual Assault, and more specifically, Non-Consensual Sexual Contact and Non-Consensual Sexual Intercourse.

32. Per WIT's Sexual Misconduct Policy, sexual assault is defined in the following ways:

    a. Non-consensual sexual contact includes, but is not limited to the unwelcome, deliberate touching of a person's intimate parts (including genitalia, groin, breast or buttock, or clothing covering those areas), or using force to cause a person to touch his or her own or another person's intimate parts.

    b. Non-consensual sexual intercourse includes penetration (anal, oral, or vaginal) by a penis, tongue, finger, or an inanimate object.

    c. Sexual assault includes any type of sexual conduct that occurs without the consent of each person involved. This includes, but is not limited to the following non-consensual acts:

        i. the deliberate touching of a person's intimate parts (including genitalia, groin, breast or buttocks, or clothing covering any of those areas), or using force to cause a person to touch his or her own or another person's intimate parts;
        ii. penetration (anal, oral, or vaginal) by a penis, tongue, finger, or an inanimate object.

33. During December 2019 and January 2020, Devonshire reached out to Jane on a few occasions regarding the investigation, however, Jane struggled to deal with the trauma as a result of the sexual assault and became extremely overwhelmed, which hindered her ability to communicate with Devonshire. Jane did not know who to turn to as a support person and advisor, and she did not know that she had the right to be appointed said support person/advisor to aid her in the investigative process because no one from the school ever informed her of this.

34. Upon information and belief, as a result of Jane's difficulties communicating due to the trauma, on January 10, 2020, the school put the investigation on hold "until further notice," rather than continuing the investigation on their own, which was an option available pursuant to the school's Student Code of Conduct policy and Sexual Misconduct policy.

35. Thereafter, on January 31, 2020 – approximately 2 months after Jane's initial rape report to the school – WIT re-opened the investigation, however, the school did not retain a third-party investigator, as was required per its own policies, until approximately February 12, 2020 – 3 months after her initial Title IX Complaint.

36. Interviews of relevant witnesses were also delayed and did not take place until 3 months after the reported rape, or in some instances, even later.  The majority of the witness interviews took place between February 25, 2020, and February 27, 2020; many of the witnesses that were interviewed are good friends with Jane's rapist, per their own reports, several of whom actually grew up with her rapist in his hometown.

37. Interestingly, Jane's rapist refused to sit down with WIT Campus Police for an interview until he retained an attorney. Finally, on March 10, 2020 – over 3 months after Jane's initial report and with the added benefit of time and/or knowledge of what his friends told investigators during their own witness interviews, the rapist submitted to an interview with investigators, with his attorney present.

38. Unsurprisingly, during his interview, Jane's rapist claimed that the sex was consensual, however, as investigators pointed out in their final report submitted to the Hearing Panel, when he was asked about the night of the rape, he "gave two versions to investigators that differed slightly."

**WIT Failed to Gather & Evaluate All the Available Evidence Relevant to Jane's Rape**

39. On February 21, 2020, Sergeant Dexter Francis was interviewed by investigators via phone in connection with Jane's Title IX rape complaint.  As stated previously, Sergeant Francis, along with Officer Moran, is the member of WIT Campus Police who first took down Jane's rape report.

40. During Sergeant Francis's phone interview with WIT's investigators, he disclosed to investigators that he had conducted additional interviews with the parties that had not been provided to Title IX, including an interview with Jane's rapist and other witnesses with relevant information.

41. Despite Sergeant Francis's disclosure regarding these additional interviews he conducted, and upon information and belief, no one from the school provided the investigators with complete copies of Sergeant Francis's incident reports, notes, and/or other documents he created pertaining to the perpetrator's additional interview and the other unidentified witnesses he apparently spoke with; the school never followed up with Sgt. Francis to determine what documents he had regarding these additional interviews and they never requested such documents; they never inquired as to when these additional interviews were conducted and who was a part of the additional interviews; and beyond the incident reports submitted to the Hearing Panel within the final investigative report (summarizing Jane's disclosure and her friend's disclosure), none of these other documents were ever requested, clarified, or submitted as evidence to the Panel during the Hearing.

42. Per WIT's Final Investigative Report, Witness 6 was interviewed by WIT Campus Police and provided 10 pages of a written statement to Campus Police regarding her

knowledge of Jane's rape.  This interview was recorded and transcribed, and the audio recording, the transcription of the audio, and the written statement were included as attachments to the WIT Campus Police incident report.  Curiously, however, these additional documents were omitted from the evidentiary materials submitted by WIT to the third-party investigators, and upon information and belief, WIT officials also failed to include these additional documents in the investigative record submitted to the Hearing Panel.

43. In his interview with the investigators, Sergeant Francis also "repeatedly stated that he did not have his file with him and could not reflect on his notes since he was at home when this interview occurred," yet no follow up interview was conducted with Sergeant Francis to ensure that his interview statement was complete and accurate in accordance with his notes, nor were his notes ever collected by the school or submitted to the Hearing Panel for review.

44. Sergeant Francis further indicated during his interview with investigators that there potentially were other people present in the room during the sexual assault, but refused to elaborate further.  No additional inquiry was made by the school to ascertain why Sergeant Francis thought that, or the source of such information.

45. Interestingly, Sergeant Francis indicated that Officer Moran had additional information regarding the rape kit that was performed on Jane at the hospital, including the information provided during the SANE and the rape kit findings that would have been noted in the nurse's report.  However, inexplicably, no one from the school followed up with Officer Moran on this or attempted to ascertain the findings of the rape kit from him, nor did anyone ask Jane about the results or attempt to retrieve such evidence from her.

46. On February 25, 2020, during Officer Moran's investigative interview, he stated that when the hospital concludes its testing on the evidence submitted (clothing, bedsheets, other physical items, and results of rape kit) they "give it back" to WIT, yet no follow up was conducted by the school related to this evidence or the related testing results and it was never included in the investigative record submitted to the Hearing Panel.

**WIT's Investigative and Adjudicatory Process Included Victim Shaming Tactics and Sex-Based Generalizations Against Jane Doe**

47. In order to ensure an objective and impartial adjudication process in compliance with Title IX, decision-making techniques or approaches that apply sex stereotypes or generalizations should not be utilized, and if they are, then it can constitute a Title IX violation. See ¶¶ 13(j) and 14, *supra*.

48. Throughout the adjudicatory process, including the investigative process up through the Panel Hearing, WIT officials, including Devonshire, the Title IX Coordinator, allowed

information and evidence to be submitted and considered by the Hearing Panel as part of the investigative record that referenced Jane's prior sexual behavior and/or history.

49. None of the prior sexual behavior/history information referring to Jane that the school included in the investigative record as part of its adjudicatory process was offered to prove that someone other than her rapist committed the sexual assault against her, nor was it related to specific incidents involving Jane's sexual behavior with her rapist that were offered to prove consent, which are the only two exceptions for inclusion of such information in the adjudicatory process, per the school's own policies.[2]

50. The information related to Jane's prior sexual behavior/history that WIT included in the investigative record (and which was considered by the Hearing Panel) utilized tragically familiar sex stereotypes and generalizations, such as "victim shaming", and falsely painted Jane as a sexually promiscuous woman whose rape complaint could be chalked up to "morning after regret" or "buyer's remorse." Notably, and upon information and belief, no information pertaining to the perpetrator's prior sexual behavior/history was included in the school's investigative record.

51. For example, WIT obtained and included the following information in the adjudicatory record, which was taken from statements made by her rapist during his investigative interview:

> "He [the rapist] has heard from Witness 14 that the Complainant would drink on Friday nights and having 'sex with a dude' is something that she [Jane] has done on multiple occasions. This had happened the previous weeks and leading up to the week of the incident, the Complainant had been stating that she was not going to do it [have sexual intercourse] that weekend [the weekend the rape occurred]. The Complainant had told Witness 14 that she didn't need male attention to be happy with herself. The Respondent said he thought that she [Jane] may have been more mad at herself for not keeping to her intentions, to not put blame on herself."

52. By way of further example and not limitation, WIT included the following "victim shaming" information (taken from various witness statements) within the adjudicatory and investigative record when assessing Jane's rape complaint:

   a. "Witness 4 and Witness 14 started to talk about how this happens a lot where the Complainant [Jane] would have sex and regret it the next morning."

   b. "Witness 14 told him [Witness 4] that the Complainant would get mad at her because Witness 14 would not stop her from having sex."

---

[2] This is a violation of WIT's own policies, as well as Title IX. See ¶ 16(a), *supra*.

11

    c. She [Jane] had been with Witness 8 before [sexually]," who was her rapist's suitemate.

    d. Jane had a prior "thing" [sexual and/or romantic relationship] with Witness 10, one of the individuals present at the dorm party held on the night of assault.

    e. During the dorm party on the night of the assault, and before the assault took place, Jane was dancing "provocatively."

    f. Jane used to date Witness 10, one of the students present at the dorm party on the night in question, and then their relationship "got weird."

    g. When Witness 8 was told that the rapist and Jane were "hooking up," he [Witness 8] "thought it was funny as they [Witness 8 and Jane] had slept with each other once."

53. As a result of this defamatory and inappropriate information being included in the evidentiary record that was used by the school to decide whether the perpetrator was responsible for allegations in Jane's complaint, Jane was deprived the opportunity of a fair and impartial adjudicatory process.

54. Throughout the spring 2020 semester, Jane's mental health deteriorated and she continued to experience significant anxiety, distress, depression, and feelings of isolation and alienation. She continued to attend counseling, but struggled in her classes and avoided social activities on campus and campus events in order to avoid her rapist and the friends who had chosen his side over hers.

**The Panel Hearing**

55. On April 21, 2020, Jane was notified by Devonshire via email that the Panel Hearing was scheduled for April 30, 2020, via Zoom, and she was also provided a copy of the Final Investigative Report for the first time.[3]

56. On April 28, 2020, Jane was made aware for the first time that she was actually supposed to attend the Hearing.

---

[3] Per WIT's Policy regarding the Formal Resolution Process, the Title IX Coordinator must "send to each Party the final investigative report in an electronic format or a hard copy, for their review. This report will be shared no less than ten (10) business days prior to a hearing."

57. On April 29, 2020, Devonshire, the Title IX Coordinator, emailed Jane stating that "you [Jane] confirmed that you do not have a hearing support person/advisor" for the Panel Hearing and that "if this changes, please let either Dean Kosses or myself know."

58. At the time, Jane did not know who to turn to or who to ask to accompany her to this Hearing as her advisor/support person. She also was unaware of the fact that even if she herself could not find an Advisor/support person for the Hearing, then the school was required, per its own policies, to appoint an Advisor on her behalf free of charge.

59. Upon information and belief, no one from the school ever informed Jane of her right to appointment of an advisor/support person during the Panel Hearing. Even when Jane approached Devonshire before the Hearing and told Devonshire that she was completely lost, overwhelmed, and confused by the process and what the Hearing entailed, Devonshire still did not inform her of her right to appointment of an advisor/support person.

60. As a result, Jane was deprived of the opportunity to meaningfully prepare for and participate in the Panel Hearing.

61. On April 30, 2020, a Panel Hearing was held virtually via Zoom to address Jane's Title IX Complaint and the related investigation. Notably, the Panel only questioned a small handful of witnesses and failed to question the only two sober students present at the dorm party on the night of the assault.

**The Hearing Panel Ignored All the Evidence Supporting the Fact that Jane was Incapacitated, and Therefore, Could Not Have Consented Pursuant to WIT's Own Policies**

62. One day after the Hearing, on May 1, 2020, the Panel concluded that Jane's rapist was not responsible for the two conduct violations he was charged with. See paragraph 32, *supra.*

63. Contrary to WIT's policy, the Panel's decision and reasons therefore were memorialized in a letter authored by Jennifer Kosses, the Assistant Dean of Students, who was not one of the decision-makers. According to Dean Kosses' letter, dated May 1, 2020, the Panel found Jane's rapist "not responsible," based on various findings or lack thereof, which include but are not limited to, the following:

    a. The Panel determined that sexual intercourse did take place between Jane and the perpetrator;

    b. The Panel found that Jane was intoxicated, but did not indicate whether they also found the perpetrator to be intoxicated;

13

    c. The Panel "was unable to determine if [Jane] was incapacitated" based on the information they had (within the investigation record and from the hearing testimony).

    d. The Panel found that "the information provided in the investigation report and the panel suggest that a sober, reasonable person would not have thought that [Jane] was incapacitated," because, according to the Panel members, the following allegedly occurred:

        i) Jane and the perpetrator "engaged in a coherent conversation about politics" prior to the sexual intercourse;
        ii) Jane retrieved a condom prior to the sexual intercourse; and
        iii) Jane "got up out of the bed and closed the door when the witnesses indicated that they opened the door to check on the parties."

64. Based on those alleged facts, the Panel concluded that "without any further information, the hearing panel was unable to make a determination whether [Jane] gave consent, but they cannot also determine that she did not. Therefore, the panel determined that [the perpetrator] was not responsible."

65. Pursuant to Wentworth's Sexual Misconduct Policy and other publications, the term "consent" as it pertains to allegations of sexual assault and determinations related to such allegations, is defined as follows:

    a. Consent must be communicated, mutual, non-coercive and given free of force or the threat of force. A student who is physically or mentally incapacitated by drugs, alcohol, due to an intellectual or other disability or other circumstances may not be capable of giving consent.

    b. Consent must be informed, freely and actively given. It is the responsibility of the initiator to obtain clear and affirmative responses at each stage of sexual involvement.

    c. Silence, previous sexual relationships or experiences, and/or a current relationship may not, in themselves, be taken to imply consent. While nonverbal consent is possible (through active participation), it is best to obtain verbal consent.

    d. Similarly, consent to one form of sexual activity does not imply consent to other forms of sexual activity. An individual who is incapacitated cannot consent.

    e. Consent to sexual activity may be withdrawn at any time through clear communication.

    f. Sexual conduct in the presence of force, coercion, and/or incapacitation is not consensual.

66. Wentworth's own policies define "incapacitation" as follows:

　　a. Incapacitation due to alcohol results from a level of alcohol ingestion that is more severe than impairment, being under the influence, drunkenness, or intoxication. Incapacitation could also result from the use of illegal, controlled substances, and/or prescription medication.

　　b. Evidence of incapacity may be detected by physical cues, such as **slurred speech**, bloodshot eyes, the odor of alcohol on a person's breath or clothing, **inability to maintain balance, vomiting, unusual or irrational behavior and unconsciousness**. Context is important in helping to determine incapacitation.

　　c. A person who is incapacitated lacks the capacity to understand or appreciate the fact, nature or extent of a sexual encounter. **States of incapacitation include, but are not limited to, unconsciousness, sleep, and blackouts**.

　　d. Where alcohol or other substances are involved, incapacitation is determined by **how the substance impacts a person's decision-making capacity, awareness of consequences, and ability to make informed judgments**.

　　e. The question of incapacitation is determined on a case-by-case basis using both objective and subjective standards. **In evaluating whether a person was incapacitated for purposes of evaluating effective consent, the University will consider:** (1) whether the person initiating the sexual activity knew that their partner was incapacitated; and if not (2) whether a reasonable person in the same situation would have known that their partner was incapacitated.

67. The Panel's assertion that they lacked sufficient information to make a determination as to whether Jane was incapacitated during the sexual intercourse was erroneous, arbitrary, capricious, and nonsensical – WIT's policies applied a preponderance of evidence standard to this proceeding and the evidence overwhelmingly established not only that Jane did not consent to intercourse, but that Jane was incapacitated and incapable of consenting to sexual intercourse; indeed, the only evidence to the contrary came from the testimony of her rapist himself, and his lifelong friends who continued to "party" outside the room as Jane was raped. .

15

68. By way of example and not limitation, the investigative record contained the following evidence, from numerous witnesses, regarding whether Jane's intoxication met the level of incapacitation on the night of the assault:

    a. Jane had "kind of passed out and that is when the [perpetrator] had picked her up and carried her to the bathroom because he said she was going to throw up";
    b. Multiple witness statements that Jane consumed a large quantity of alcohol that night;
    c. Jane's own statements that she lost consciousness during the assault and experienced a blackout before, during, and after;
    d. Sergeant Francis's statement (who has years of experience in working sexual assault cases) that he believes due to Jane's alcohol consumption on the night in question, he believes she "could have experienced blackout";
    e. Witness statements that Jane became "slumpy" and at one point, was "slumped over a chair" next to the perpetrator;
    f. Jane "was slurring her speech";
    g. At one point Jane could not move, so [perpetrator] carried her to the bathroom;
    h. Jane was described by others to be "very intoxicated" and "that night [of the assault] was one of the worst" in terms of Jane's intoxication;
    i. Jane looked like she had "drunk too much";
    j. Jane stated she "felt sick" and nauseous;
    k. She needed assistance getting into her bedroom and friends put a trashcan next to her in case she puked;
    l. Dean Wenner was told by Sergeant Francis that Jane was "incapacitated and thus unable to give consent";
    m. One of two sober witnesses in attendance at the dorm party described Jane as "could not really stand on her feet and she was tripping over people";
    n. Jane was described as "obviously very drunk" and "much drunker than anyone else";
    o. Jane was "dizzy";
    p. The other sober witness present the night of the assault described the perpetrator as "not that drunk" and described Jane as "completely wasted" and unable to walk in a straight line and "was leaning on people as she could not stand."
    q. That same sober witness also described how the perpetrator carried Jane to the bathroom because she was "too drunk to walk" and saw Jane puking in the bathroom in the presence of the perpetrator.

69. Contrary to WIT policy, and despite ample evidence within the record, the Panel did not make any factual findings, using the preponderance of the evidence standard, as to whether Jane was incapacitated, whether the perpetrator knew Jane was incapacitated, and whether Jane consented to the sexual intercourse.

70. Currently, Jane's rapist still attends WIT with her, and she is forced to actively avoid him on campus, as each time she encounters her rapist, she experiences re-traumatization all over again. As a result, Jane is very limited in her ability to participate in various programs, classes, and activities on campus.

71. As a direct and proximate result of the events described herein, Jane experienced, and continues to experience, significant damage. By way of example and not limitation, Jane was forced to seek out therapy and counseling for her declining mental health, she incurred medical expenses, loss of enjoyment of life, limitations and/or deprivations on her ability to participate in, and receive benefit from, various educational activities and/or programs, and she developed anxiety and depression, requiring continued treatment and therapy.

CLAIMS OF THE PLAINTIFF AGAINST THE DEFENDANT, WENTWORTH INSTITUTE OF TECHNOLOGY, INC., d/b/a WENTWORTH INSTITUTE OF TECHNOLOGY

## COUNT I
### Sex Discrimination in Violation of Title IX (Deliberate Indifference)

72. The Plaintiff incorporates all previous paragraphs by reference as if fully stated herein.

73. While a student at WIT, Jane sustained harassment and discrimination based on her sex that was so severe, pervasive, and/or objectively offensive that it effectively denied and/or limited her access to and ability to participate in educational resources, benefits, programs, and/or opportunities, and/or subjected her to a hostile or abusive educational environment.

74. The sexual assault and discrimination of Jane occurred in a context where WIT exercised substantial control over her rapist and the environment in which the sexual assault took place, as Jane's rapist was and is under WIT's disciplinary authority since he is a student himself and the sexual assault occurred on school grounds. Thus, WIT could have, and should have, taken appropriate remedial action in adherence to their policies.

75. WIT had actual knowledge of the sexual assault and discrimination sustained by Jane because she reported it directly to multiple university officials, including those who had the authority to address the sex-based discrimination and institute adequate protective measures on behalf of the school, in accordance with their own policies and procedures.

76. WIT's response to the sexual assault and discrimination sustained by Jane, and/or its lack of a response, was deliberately indifferent, insofar as its conduct was clearly unreasonable in light of known circumstances, thereby subjecting Jane to continued sex-based discrimination and/or making her more vulnerable to it.

77. As a direct and proximate result of the Defendant's acts and omissions, Jane sustained significant injuries and damages, including but not limited to emotional distress and trauma, psychological injuries requiring professional treatment, financial loss, medical expenses, and loss of enjoyment of life.

## COUNT II
### Erroneous Outcome in Violation of Title IX

78. The Plaintiff incorporates all previous paragraphs by reference as if fully stated herein.

79. While a student at WIT, Jane sustained harassment and discrimination based on her sex that was so severe, pervasive, and/or objectively offensive that it effectively denied and/or limited her access to and ability to participate in educational resources, benefits, programs, and/or opportunities, and/or subjected her to a hostile or abusive educational environment.

80. For the reasons previously stated herein, the Defendant conducted an inadequate, incomplete, biased, and unfair investigation and adjudicatory process, which resulted in the erroneous outcome that Jane's rapist was "not responsible" for sexually assaulting her, and therefore, undisciplined.  In their actions, the Defendant was motivated by bias with respect to sex.

81. The Plaintiff suffered an erroneous outcome in the school's adjudicatory process pertaining to her sexual assault complaint, which was based on her gender and contrary to the school's own policies.

82. As a direct and proximate result of the Defendant's acts and omissions in reaching its erroneous outcome, Jane's ability to participate in and benefit from educational programs was restricted, and she sustained significant injuries and damages, including but not limited to emotional distress and trauma, psychological injuries requiring professional treatment, financial loss, medical expenses, and loss of enjoyment of life.

## COUNT III
### Breach of Contract

83. The Plaintiff incorporates all previous paragraphs by reference as if fully stated herein.

84. Jane applied to and enrolled as a student at WIT and pays all required tuition, fees, and expenses.

85. Jane's application to and enrollment as a student at WIT was done in reasonable reliance on WIT's representations, and with the reasonable expectation, that WIT would implement and enforce the provisions and policies set forth in its official publications, including but not limited to its Student Code of Conduct and Sexual Misconduct Policy.

86. An express contract or, alternatively, a contract implied in law or in fact was formed between Jane and WIT.

87. By the aforementioned conduct described herein, WIT breached its contract with Jane in a variety of ways, including but not limited to the following:

    a. Failing to objectively and adequately investigate her complaint;
    b. Failing to gather, evaluate, and consider all the relevant evidence in rendering its decision;
    c. Failing to utilize the preponderance of the evidence standard in reaching its determination;
    d. Including improper information within the investigative record and in the adjudicatory hearing;
    e. Failing to comply with its obligations under Title IX;
    f. Failing to comply with the Department of Education's Guidance on Title IX;
    g. Failing to provide an environment free from sex-based discrimination and harassment and its promise to address gender-based misconduct; and
    h. Failing to comply with its other obligations in response to student complaints of sexual misconduct, as outlined in WIT's policies and publications.

88. Jane has performed all conditions required of her under the terms of WIT's Publications.

89. As a result of WIT's breach of its own policies, procedures, and publications, as set forth previously, Jane incurred significant damages, including but not limited to emotional distress and trauma, psychological injuries requiring professional treatment, financial loss, medical expenses, and loss of enjoyment of life.

**PRAYER FOR RELIEF**

    The Plaintiff respectfully requests that this Honorable Court enter judgment in her favor on all claims and:

1. Award Plaintiff compensatory and punitive damages;
2. Award Plaintiff her attorneys' fees, plus interest and costs; and
3. Award Plaintiff any other equitable relief that this Court deems just and proper.

*The Plaintiff demands a trial by jury on all claims so triable.*

    Respectfully Submitted,
By Plaintiff's Attorneys,

**/s/ John T. Martin**_____
John T. Martin, BBO # 676344
jmartin@kjclawfirm.com
Michaela M. Weaver, BBO # 705985
mweaver@kjclawfirm.com
KJC Law Firm, LLC
One Exchange Place, 2nd Level
Worcester, MA 01608
(617) 720-8447

Dated: May 20, 2021